[No. 482.    On Rehearing August 17, 1893.]

## TERRITORY OF NEW MEXICO, APPELLEE, v. V. P. EDIE, APPELLANT.

CRIMINAL LAW—RAPE—MISCONDUCT OF JURY.—In a prosecution for rape, where the jury had reached a verdict of guilty, one of the jurors came out of the jury room into the court room, and had an officer write out a form of verdict, the substance of which was directed by the juror, who then immediately returned with it into the jury room, without any other conversation between them, or with any other person in the juror's presence —Held: The transaction was apparently harmless, without prejudice to defendant's rights, and the verdict ought not to be disturbed. Mattox v. United States, 13 Sup. Ct. Rep. 50, 146 U. S. 140, distinguished.

APPEAL from the Second Judicial District Court, Bernalillo County. Former opinion affirmed; SEEDS and FALL, JJ., dissenting.

The case on the rehearing is stated in the opinion of the court.

NEILL B. FIELD for appellant.

EDWARD L. BARTLETT, solicitor general, and W. H. WHITEMAN for appellee.

O'BRIEN, C. J.—At the last term the defendant moved for and obtained a rehearing in this cause. He then insisted, as he now insists, that the rule adopted by us in deciding it, as to the effect of the misconduct of the trial jury (see opinion 30 Pac. Rep. 851), is at

variance with the doctrine enunciated in the federal supreme court in the case of Mattox v. U. S., 13 Sup. Ct. Rep. 50, 146 U. S. 140. It is, perhaps, at least in a partial sense, to be regretted that this judgment must be affirmed. The evidence, we are free to admit, is not overwhelmingly convincing. But it is legally sufficient to warrant the verdict. In such case we are not at liberty to interfere with the finding of the jury. From the very nature of the crime, it would be unreasonable to expect superabundant evidence of guilt. Men of loose morals, intent alike upon the gratification of their inordinate desires and the ruin of female purity, almost invariably seek seclusion as most opportune for the gratification of their reckless passions. The victim of this defendant's lust was almost a child, a stranger in a strange city, without a friend, except a father, to vindicate her honor. The jury heard the narrative of the transaction, as detailed by her, as well as by the defendant. Her version was believed. His, at least so far as it was inconsistent with hers, was discredited. We have as little reason as we have right to criticise the result. The testimony of the defendant, whether believed by the jury or not, as disclosed by the record, exhibits him as a man of low instincts and depraved morals. It shows that he had planned the girl's defilement, and used the most insidious means for its accomplishment. If not, why did he invite the girl, almost a stranger to him, into his buggy? why did he keep her out all the afternoon? why did he dose her with wine? why did he not return before dark? why did he take her to his private room? why did he lock the door and detain her there?—if he did not intend, when he first saw her on the sidewalk, to make her the victim of his lust? He was a man of mature years. She was a comparative child. In a case of this character, nothing short of error prejudicial to the defendant's rights would justify us in setting aside the

verdict of his guilt, and awarding him a new trial. At the time this case was first heard the opinion of the supreme court in the Mattox case had not been published, and the opinion of this court was prepared in accordance with what we believed to be the prevailing doctrine in this country. The defendant in the Mattox case, charged with the murder of one John Mullen in a part of the Indian Territory embraced within the judicial district of the state of Kansas, was tried and convicted in the district court of the United States at Wichita. Sentence of death was pronounced upon the accused, and he took the case to the supreme court of the United States upon a writ of error, where the judgment was reversed upon various alleged grounds of error. In that case the defendant, in support of his motion for a new trial, offered in the court below the affidavits of two of the trial jurors to the effect that the bailiff who had charge of the jury, after the cause had been heard and submitted, and while they were deliberating upon their verdict, in the presence and hearing of the jurors, or a part of them, speaking of the case, said: "After you fellows get through with this case, it will be tried again down there. Thompson has poison in a bottle that them fellows tried to give him." And at another time, in the presence and hearing of the jury, or a part of them, referring to the defendant, Clyde Mattox, he said: "This is the third fellow he has killed." The affidavit of another juror to the same effect, in respect of the remark of the bailiff as to Thompson, was also offered, and in addition, the affidavits of eight of the jurors, including the three just mentioned, "that after said cause had been submitted to the jury, and while the jury was deliberating of their verdict, and before they had agreed upon a verdict in the case, a certain newspaper, printed and published in the city of Wichita, Kansas, known as the Wichita Daily Eagle, of the date

*RAPE: misconduct of jury.*

of Thursday morning, October 8, 1891, was introduced
into the jury room; that said paper contained a com-
ment upon the case under consideration by said jury, and
that said comment upon said case so under considera-
tion by said jury was read to the jury, in their presence
and hearing; that the comment so read to said jury is
found upon the fifth page of said paper, and in the
third column of said page, and is as follows: 'The
Mattox Case.—The Jury retired at Noon Yesterday,
and is Still Out.—The destiny of Clyde Mattox is now
in the hands of the twelve citizens of Kansas compris-
ing the jury in this case. If he is not found guilty of
murder, he is a lucky man, for the evidence against
him was very strong, or at least appeared to be to an
outsider. The case was given to the jury at noon yes-
terday, and it was expected that their deliberations
would not last an hour before they would return a ver-
dict,' '' etc. The bill of exceptions states that these
affidavits and a copy of the newspaper were offered in
the trial court by the defendant in support of his
motion for a new trial, and by the court excluded.

Chief Justice FULLER, in delivering the opinion of
the supreme court, says: ''Private communications,
possibly prejudicial, between jurors and third persons,
or witnesses, or the officer in charge, are absolutely
forbidden, and invalidate the verdict, at least unless
their harmlessness is made to appear.'' The chief
justice continues: ''The jury in the case before us
retired to consider of their verdict on the seventh of
October, and had not agreed on the morning of the
eighth, when the newspaper article was read to them.
It is not open to reasonable doubt that the tendency of
that article was injurious to the defendant. State-
ments that the defendant had been tried for his life
once before, that the evidence against him was claimed
to be very strong by those who had heard all the testi-
mony, that the argument for the prosecution was such

that the defendant's friends gave up all hope of any result but conviction, and that it was expected that the deliberations of the jury would not last an hour before they would return a verdict, could have no other tendency. Nor can it be legitimately contended that the misconduct of the bailiff could have been otherwise than prejudicial. Information that this was the third person Clyde Mattox had killed, coming from the officer in charge, precludes any other conclusion. We should, therefore, be compelled to reverse the judgment because the affidavits were not received and considered by the court; but another ground exists, upon which we must not only do this, but direct a new trial to be granted." It will be apparent, upon comparing the affidavits set out in the opinion in this case with the affidavits in the Mattox case, that there are few, if any, points of similarity. The bill of exceptions in the case at bar contains another affidavit, made by officer Hubbell, and which was considered by the court upon hearing the motion for a new trial, which unmistakably shows that we are not in conflict with the doctrine found in the case cited, in deciding this case as we did. That affidavit is as follows: "Thomas S. Hubbell, being first duly sworn, on his oath deposes and says that he is a deputy sheriff of Bernalillo county, in the territory of New Mexico; that on the night of the twenty-fifth of March, 1891, he slept in the court-house in Bernalillo county, with Vicente Armijo, court bailiff, who had charge of the petit jury during its consideration of the case of the Territory of New Mexico versus V. P. Edie, charged with rape; that said jury was kept together that night in a room leading off from said court room; that about the hour of six and a half o'clock on the morning of the twenty-sixth of March, 1891, one of said jurors, named Jose Dario Aragon, came out of the jury room into the court room, and asked affiant if he could and would

write out the form of a verdict for the use of the jury; that affiant then took up a piece of paper, and with a lead pencil proceeded to write out the form of a verdict, and he then asked the said juror whether the form should be that of guilty or not guilty; that the said juror replied that the form should be guilty, and assessing his punishment at five years in the penitentiary; that affiant then completed a form of verdict in accordance with such directions, and handed the same to said juror, who then immediately returned into the jury room. Affiant says that no conversation occurred between him and the said juror, or with any other person in his presence, about said case, other than is herein stated, and further he saith not." This affidavit, and the one set out in the opinion, negative the possibility of prejudice to defendant's rights, and render apparent the harmlessness of the transaction. The facts revealed by the affidavits in the Mattox case were radically different, and rendered not only possible, but highly probable, the injurious effect of the misconduct charged and admitted. It would subserve no useful purpose to make extended remarks upon the great dissimilarity between the facts in the two cases. We are free to admit that, if the affidavits in the present case disclosed even a fractional part of the outrageous misconduct apparent in the Mattox case, we would have no hesitancy in reversing the judgment and awarding a new trial.

Defendant contends that the rule followed in the decision of the present case, to wit, "it is now almost universally established that, unless it appears that such interference takes place for some corrupt or sinister purpose, or that such conduct has been prompted by the parties, and has resulted injuriously to one of such parties, the verdict will not be disturbed, either in civil or criminal cases," is in irreconcilable conflict with the doctrine announced in the Mattox case by the federal

supreme court.   The language chosen by us to express
the rule may not be faultless.   It was used in the light
of the record disclosing the misconduct of one of the
trial jurors.   That record, containing the two affidavits
of the deputy sheriff, instead of showing prejudicial
error, renders apparent the harmlessness of the im-
proper transaction.   It is to be presumed that the
affidavits fully reveal all the facts and circumstances of
the alleged misconduct.   If so, it is manifest that the
error committed was not injurious to the rights of the
defendant.   In the case before the United States
supreme court the affidavits for a new trial showed
that the baliff stated to the jury that Mullen was the
third person killed by Mattox.   They further showed
that a local newspaper, containing a bitter article
upon the bad character of the defendant, and the views
of the community as to the proof of his guilt, had been
introduced into the jury room, and read to the jurors,
while examining the testimony, and deliberating upon
their verdict, and the language used in the opinion
was predicated upon these facts.   Prejudicial error
is as apparent in the federal case as is its absence in
the case before us.   But, if modifying the general rule
before cited, and adopting for the purpose of this
decision the doctrine of the supreme court of the
United States in the Mattox case, that "private com-
munications, possibly prejudicial, between jurors and
third persons, or witnesses, or the officer in charge,
are absolutely forbidden, and invalidate the verdict,
at least unless their harmlessness is made to appear,"
we must still hold that the conclusion reached may
safely rest upon the principle embodied in the latter
rule, as the record makes apparent the harmlessness of
the alleged misconduct.   The precise point presented
for determination in the Mattox case was the alleged
error of the trial court in refusing to receive the jurors'
affidavits showing the misconduct complained of, and

not error in refusing to set aside the verdict on account
of such misconduct. In the present case the affidavits of
the deputy sheriff were received and considered, and
were found by the trial judge insufficient to warrant
the vacating of the verdict. In so doing, can we say
that the rule announced in the Mattox case was vio-
lated? Can we say that the judge below abused the
discretion with which the law invests him, in conclud-
ing, upon a full and fair consideration of the affidavits
presented, that the harmlessness of the transaction
was apparent? If we do, we establish a rule fraught
with danger to the best interests of the community,
and add a new element of uncertainty to the deter-
mination of criminal prosecutions. We do not over-
look defendant's rights. Great as is the crime of which
he has been convicted, it would be a still greater crime
to allow such conviction to stand, if procured in viola-
tion of his constitutional rights. The forcible language
used by Chief Justice FULLER was, no doubt, inspired
by the nature of the record before him; but adopt it as
a rule in this territory, in the sense claimed for it by
the appellant, and New Mexico would soon become
the nursery of crime, and the paradise of criminals.
In other countries, where English is the language of
all the people; where court officers and jurors under-
stand the language of the judge; where the bailiff in
charge fully realizes the nature of his oath, and the
obligations thereof; where all or a greater part of the
jurors are able to formulate and write down their ver-
dict without assistance from others; where the facil-
ities and conveniences surrounding the jurors are
ample and suitable; where outside interference and
favoritism are regarded as evidence of corruption,—the
adoption of the rule, in the limited sense claimed by
the appellant, though not generally favored in states
not bound, as we are, to follow federal decisions,
might not be attended with great danger. Still, it

would have a tendency to render the administration of criminal justice almost impossible in New Mexico. A harmless whisper or a meaningless nod might be sufficient, in certain cases, to cheat the gallows of a deserving victim. Hence we are constrained to hold, in the present case, that the trial judge was fully justified in refusing to set aside the verdict and grant a new trial. We are satisfied that the correct reading of the two affidavits made by deputy sheriff Hubbell makes apparent the harmlessness of· the communication between himself and the derelict juror. As the foregoing is the chief error, deserving attention, upon which the defendant relies for a reversal, we are unable to change our opinion, and the judgment must stand affirmed.

FREEMAN, J., concurs.

SEEDS, J. (dissenting).—Not being able to arrive at the same conclusion as the majority of the court in reference to the disposition of this case, I have thought proper to briefly give my reasons for dissenting. The case is before us upon a rehearing. I am perfectly satisfied with the result upon the merits, but as to the error complained of, in regard to the reprehensible conduct of one of the jurors, I feel that we have, in our previous decision, laid down a rule which, while then in consonance with the great weight of authority, is now, by reason of a late decision of the supreme court of the United States, not law for this court. We are bound by the rulings of the supreme court of the United States. In the case of Clyde Mattox v. U. S., 146 U. S. 140, 150, 13 Sup. Ct. Rep. 50, in discussing the effect of communications made to a juror or jurors by an officer of the court, Chief Justice FULLER says: "Private communications, possibly prejudicial, between jurors and third persons, or witnesses, or the officer in charge, are absolutely forbidden, and invalidate the verdict, at least unless their harmlessness is

made to appear." In the previous decision of this case (Territory v. Edie, 30 Pac. Rep. 851) Chief Justice O'BRIEN says: "It is now almost universally established that, unless it appears that such interference takes place for some corrupt or sinister purpose, or that such conduct has been prompted by the parties, and has resulted injuriously to one of such parties, the verdict will not be disturbed, either in civil or criminal cases." It is quite apparent that these two rules are opposed to each other. The one throws the burden upon the territory to prove the acts done not prejudicial, they being assumed to be such. The other casts the burden upon the accused to prove the acts injurious or prejudicial to him. The one enunciated by the United States supreme court must govern, provided it is a rule adopted by that court upon a point directly before them. It is suggested that the rule is obiter dictum, but I can not so consider it.

In the case where this rule is laid down, it is true that the record shows that the lower court refused to consider the affidavits of certain jurors which proved the acts complained of; and the point was urged that an appellate court will not review the action of a trial court in overruling a motion for a new trial, that being in the sound discretion of the trial court. This was not denied, but the court held that, as the trial court refused to consider the affidavits, that it had not exercised its discretion at all, and hence it proceeded to consider whether that court ought to have considered the affidavits, and how, and, in arriving at its conclusion that there was error in refusing to consider the affidavits, the court shows why, legally, they ought to have been considered, and in what manner. If the court had stopped short of enunciating the rule which they did, if it is law, they would have sent the accused back to be tried in accordance with a rule which they recognized not to be law. The question before the

supreme court was not, alone, ought the affidavits to have been received, but for what purposè. And the decision is that affidavits may be received to show that acts have transpired with or in the presence of jurors possibly prejudicial to the accused, and, if so, then a sound discretion would at once award him a new trial, unless the prosecution made their harmlessness to appear. Without the rule laid down the decision would have been valueless to the law, and possibly only a temporary benefit to the accused. It is, however, urged that the affidavits in this case show that the act was harmless. There are two objections to this contention: First, I think that they show very plainly the possibility of prejudice, and not one thing to explain away that possible prejudice. It was well insisted, upon argument, that there was a possibility—yes, a probability—that the juror who came and obtained the verdict in the handwriting of an influential officer might, with great effectiveness, overcome the scruples of a dissenting juror by showing him that his especial friend or master thought the accused guilty. Where is there anything in the affidavits to show that this possibility did not occur? If there is nothing to show this harmlessness in the record, it must be presumed that the accused was injured. But, in the second place, I do not believe that the lower court ever used its sound discretion upon the matter, and hence, under the acknowledged point of the decision of Mattox v. U. S., supra, he is entitled to a new trial. I understand that a ‘‘sound discretion’’ means a discretion exercised upon all the facts in the case in accordance with the law. It must, then, be presumed that the lower court passed upon the affidavits before it under the view of the law as then held by this court,—that, if there was any injury in the act complained of by the accused, it was his duty to establish ‘‘that such interference takes place

for some corrupt or sinister purpose, or that such conduct has been prompted by the parties, and has resulted injuriously to one of such parties." It may be conceded that the accused failed to meet the requirements of this rule. But that was not the law, and if the law, as now enunciated, had been the rule by which the court had exercised its discretion, it is possible that a new trial might have been granted the accused. It is no answer to this position to say that the territory introduced another affidavit which tends to show the harmlessness of the act complained of, for it could not have been for that specific purpose, as there was no law then which required such a procedure. It may be urged that we can readily see by the affidavits that the act was harmless, and hence it is a "vain thing" to reverse the case, and send it back for a new trial. I have shown already that I do not draw that conclusion from the affidavits, and it is possible that the trial court might not arrive at that conclusion. But that is not the question. The accused was entitled, under the law, to have his motion for a new trial passed upon, in the first place, by the trial court, not by this court, according to the due course of law. He was entitled to a sound legal discretion upon that right, and, not having had such a ruling, he has presumptively been prejudiced. Crime ought to be punished with as little delay as possible, consistent with the orderly administration of law, and without any sentimentality. But there is, in my judgment, as great a danger, if not greater, in turning aside from the proper rules for the administration of criminal procedure, even where it may be clearly seen that no practical injustice is being done, as there is in giving way to the sentimental expressions of our nature. It is far better that some acts of wrong go "unwhipped of justice" than that it be known that juries may be tampered with, and yet their verdicts stand. The sure, unchanging, and absolutely pure

administration of the forms of law is the only safe protection for innocence and liberty, and under such administration it is hardly probable that crime will fail of being punished.  I am of the opinion that the judgment ought to be reversed.

FALL, J.—I agree with the conclusions reached by Judge SEEDS.